IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

MAY -5 2017

ARTHUR JOHNSTON
BY_____ DEPUTY

WILLIAM L. LAMEY, individually, and
on behalf of a class of similarly situated
individuals,

        Plaintiff(s),

        v.

NAVIENT SOLUTIONS, LLC, d/b/a
the NAVIENT CORPORATION,
d/b/a NAVIENT SOLUTIONS, INC.,
d/b/a SLM, INC., d/b/a SALLIE
MAE; KEVIN MASON, P.A.; GM
LAW FIRM, LLC; KEVIN P. MASON,
in his individual capacity; CHANTEL L.
GRANT, in her individual capacity;
JOHN AND JANE DOES 1-5; and
XYZ BUSINESS ENTITIES 1-5

        Defendant.

Civil Action No. _3:17cv 341 DPJ-FKB_

## COMPLAINT

THE PLAINTIFF, William L. Lamey, individually, and as prospective Class

Representative, on behalf of all of those similarly situated, under Federal Rule of Civil

Procedure 23, files suit against the above-named Defendants, and pleads as follows:

*(JURY TRIAL DEMANDED; AND
REQUEST FOR CLASS CERTIFICATION UNDER F.R.C.P. 23)*

## INTRODUCTION

1.     Plaintiff, William L. Lamey ("Plaintiff" or "Mr. Lamey") brings this action for

himself, and on behalf of all persons in the United States who: (1) have suffered from

unlawful, fraudulent, or deceptive loan-inducement activities as relates to their private

student loans originated, or serviced by, SLM, Inc., d/b/a Sallie Mae ("Sallie Mae") or

Navient Solutions, LLC d/b/a the Navient Corporation, or its wholly-owned subsidiary,

Navient Solutions, Inc. (the "Navient Defendants"), formerly known as Sallie Mae, Inc., in

violation of The Truth in Lending Act (TILA), 15 U.S.C. § 1601, *et. seq.*, as amended, and

other common law duties; (2) have suffered from unlawful collection activities by the

Navient Defendants as relates to their Navient-serviced student loans under the Consumer

Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565; the Fair

Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681 *et seq.*, and its implementing regulation,

Regulation V, 12 C.F.R. part 1022; the Fair Debt Collection Practices Act (FDCPA), 15

U.S.C. §§ 1692 *et seq.*; and the Telephone Consumer Protection Act (TCPA), 47 U.S.C. §§

227 *et seq.*, based upon unlawful acts and practices in connection with Defendants' servicing

and collection of student loans; and (3) who have suffered financial loss at the hands of

Defendants, Kevin Mason, P.A., GM Law Firm, LLC, Kevin P. Mason, esq., individually, or

Chantel L. Grant, esq., individually (the "Attorney and Law Firm Defendants"), due to those

attorneys', and their law firms': legal malpractice, breach of contract, breach of express and

implied warranties, breaches of fiduciary duties, or fraud as relates to these Defendants'

improperly-solicited legal services of so-called "private student loan debt resolution."[1]

---

[1] There are three distinct categories (each with their own proposed sub-classes) of proposed Classes, under F.R.C.P. 23, pleaded in this Complaint: (1) the Class related to the fraud-in-the-inducement, and other statutory and common law claims against Sallie Mae and the Navient Defendants as relates to the origination of the Class Members' private student loans; (2) the Class that has suffered FDCPA, FCRA, and other common law and statutory violations, as pleaded in this Complaint, against the Navient Defendants as relates to the unlawful or improper servicing of their Navient-serviced student loans; and (3) the Class of deceived, tricked, or otherwise negligently-represented clients of Kevin Mason, Chantel Grant, Kevin Mason, P.A., and GM Law Firm, LLC, who have been tricked or negligently-advised to enter into the disastrous so-called "private student loan resolution" services that have been improperly-solicited by the Attorney and Law Firm Defendants in this matter.

2.      This case arises out of three categories of damages[2] suffered by Mr. Lamey's, and the Class Members, as it relates to the inducement, origination, servicing, collection, and the so-called "private student loan resolution" legal services provided by the various Defendants to this action.

3.      As to the first proposed Class in this action (the "Private Student Loan Inducement and Origination Class"): Sallie Mae, or the Navient Defendants, with actual knowledge, and from the years of 2005 to approximately 2015, misrepresented to Mr. Lamey and the Class Members (of the first-proposed Class in this matter) material information regarding the following: all material details regarding the terms of repayment of their private student loans, including disclosure of materials terms related to forbearances, the interest rates, and the total estimated cost of these loans, with all financing and interests costs, over the estimated life of the loans; the true employment statistics, including average salary information, of the graduating classes of the various educational institutions[3] of the Class Members of the first proposed Class in this Complaint; and the failure of Sallie Mae and the Navient Defendants to accurately disclose the fact that private student loans, in most cases, are eligible for discharge under the United States Bankruptcy Code and are subject to statutes of limitations under the governing state law for those private student loan promissory notes.

---

[2] *See* Footnote 1, *supra.*
[3] In the case of the named-Plaintiff, Mr. Lamey, this being graduates with philosophy, or other average-low-income-producing-degrees, from the private Millsaps College in Jackson, Mississippi. This grossly-negligent, or predatory, behavior on the part of Sallie Mae, Navient, and the complicit colleges and universities that this practice also profits, has been widespread across the United States, harming tens, if not hundreds of thousands, of former students now in their mid-20's to mid-30's in what is a brewing-crisis that will likely rival the mortgage crisis and corresponding Great Recession of 2008.

4.      As to the second Proposed Class in this action (the "Navient-Serviced Private Student Loan Class): Navient has failed to perform its core duties in the servicing of its portfolio of private student loans, including the Navient-serviced private student loans of Mr. Lamey, Plaintiff, and the Navient-Serviced Private Student Loan Class Members, in violation of federal consumer financial laws, as well as the trust that borrowers, like Mr. Lamey and the Navient-Serviced Private Student Loan Class Members, have placed in the company. Most federal student borrowers have a right under federal law to set their monthly student loan payment as a share of their income, an arrangement that can offer borrowers extended payment relief and other significant benefits. Navient systematically deterred numerous borrowers from obtaining access to some or all of the benefits and protections associated with these plans. Despite assuring borrowers that it would help them find the right repayment option for their circumstances, Navient steered these borrowers experiencing financial hardship, like Mr. Lamey and the Class Members he seeks to represent, into costly payment relief designed for borrowers experiencing short-term financial problems, before or instead of affordable long-term repayment options that were more beneficial to them in light of their financial situation.

5.      Navient, formerly known as Sallie Mae, Inc., is the largest student loan servicer in the United States. Navient services the loans of more than 12 million borrowers, including over 6 million customer accounts under a contract with the U.S. Department of Education, and more than $300 billion in federal and private student loans.

6.      Navient's principal responsibilities as a servicer include managing borrowers' accounts; processing monthly payments; assisting borrowers to learn about, enroll in, and

remain in alternative repayment plans; and communicating directly with borrowers about the repayment of their loans.

7.      For borrowers who did enroll in long-term repayment plans, Navient failed to disclose the annual deadline to renew those plans, misrepresented the consequences of non-renewal, and obscured its renewal notice to borrowers who were due for renewal. As a result, the affordable payment amount expired for hundreds of thousands of borrowers, resulting in an immediate increase in their monthly payment and other financial harm.

8.      Upon information and belief, and since at least July 2011, tens of thousands of borrowers and cosigners have filed complaints with Navient, the Bureau, other governmental and regulatory agencies, and other entities about the difficulties and obstacles they have faced in the repayment of their federal and private student loans serviced by Navient.

9.      Taken together, these wrongful or grossly-negligent practices of the Navient Defendants prevented some of the most financially vulnerable borrowers, like Mr. Lamey and the Class Members he seeks to represent, from securing some or all of the benefits of plans that were intended to ease the burden of unaffordable, and fraudulently-induced, student debt.

10.     As to the third proposed Class in this action (the "Attorney and Law Firm Class"): Florida attorneys Kevin Mason and Chantel Grant, and their law firms, Kevin Mason, P.A., and GM Law Firm, LLC (the "Attorney and Law Firm Defendants"), and John and Jane Does 1-5 and XYZ Business Entities 1-5 (the "presently unknown Defendants"), have committed legal malpractice (and other acts of gross negligence), or in the alternative,

breaches of contract, express and implied warranties, fraud in the inducement, fraud-in-the-factum, breaches of fiduciary duties, and other violations of common law and statutory duties owed to Mr. Lamey and the Class Members he seeks to represent, comprised of current and former clients of the Defendants referenced in this Paragraph.

11.     As detailed further, *infra*, in this Complaint, Mr. Lamey and the Attorney and Law Firm Class Members have suffered financial damages at the hands of the Attorney and Law Firm Defendants via the so-called "private student loan debt resolution" legal services that these Defendants, and the presently unknown Defendants[4], have improperly-solicited to Mr. Lamey and the Attorney and Law Firm Class Members.

12.     In brief, the grossly-negligent, or fraudulent, so-called "private student loan debt resolution" legal services that the Attorney and Law Firm Defendants, and the presently unknown Defendants, have solicited to Mr. Lamey, and the Attorney and Law Firm Class Members, work as follows: these Florida attorneys, through a variety of business entities, some of which, upon information and belief are incorporated in the State of Delaware, solicit (via cold calls or direct solicitations through the mail[5]) consumers struggling with the repayment of their Navient-serviced private student loans to enter into a so-called "private student loan debt resolution program" that the Attorney and Law Firm Defendants have negotiated with Sallie Mae/Navient. This program, upon information and belief does not, in fact exist. However, through fraud, or gross negligence on the part of the Attorney

---

[4] Attorneys, Kevin Mason and Chantel Grant, have solicited these so-called "private student loan resolution" legal services under a variety of company names, to be discovered, and added to this litigation, upon discovery of their identities.
[5] It is unclear, and will be a point of discovery, to determine how the Attorney and Law Firm Defendants obtain their lists of prospective "clients" (victims) that they use to solicit customers into their so-called "private student loan debt resolution program."

and Law Firm Defendants, **Mr. Lamey, and the Attorney and Law Firm Class Members that he seeks to represent, have (purportedly and allegedly) agreed to pay, unbeknownst to them, the Attorney and Law Firm Defendants 50% of their total student-loan-balance, in monthly payments, for ten years.** These payments, it is later discovered (but which was not disclosed to Mr. Lamey and the Attorney and Law Firm Class Members), are not applied, in any way, to their student-loan-balances, and instead are fees that have been kept by the Attorney and Law Firm Defendants, especially Florida attorneys, Kevin Mason and his law partner, Chantel Grant.

13.     If Plaintiff and Inducement/Origination Class Members knew about the material information that Sallie Mae and the Navient Defendants knew, and had a duty to disclose, but did not, then Plaintiff and Inducement/Origination Class Members would not have agreed to take out their private student loans, or they would have found more economically-appropriate educational programs, institutions, and financing-arrangements for their undergraduate educations.

14.     Due to their reasonable reliance on Inducement/Origination Defendants' material misrepresentations and omissions, Plaintiff and the Inducement/Origination Class Members have suffered an ascertainable loss of money, property, and value, as well as serious harms to their credit reports, and related consequential damages.

## THE PARTIES

*(The Plaintiff)*

15.     Plaintiff, William L. Lamey, is a Mississippi citizen who resides in Jackson, Hinds County, Mississippi, and who may be served via his counsel-of-record in this matter.

16.     On or about the Fall of 2001, Mr. Lamey – like tens, if not hundreds of thousands of similarly-situated, prospective students – was fraudulently-induced to enter private student loan contracts with Sallie Mae (now Navient) for the financing of a university degree, the true economic value of which, was misrepresented or concealed to Plaintiff and the Inducement/Origination Class Members. Mr. Lamey financed his private, Millsaps College, bachelor of arts degree in philosophy and religion, which he received in May of 2006, with private Sallie Mae student loans.

17.     Plaintiff, only 18 at the time, reasonably relied, to his detriment, on the employment statistics, average income data, and other financial data provided to him by Sallie Mae regarding his course of study in philosophy and religion at the private Millsaps College in Jackson, Mississippi. This data turned out, in hindsight, to be false, misleading, and otherwise materially-incomplete for its explicitly-intended purpose, to advise prospective borrowers of Sallie Mae loans of the reasonable of such financing-arrangements for their school, degree, etc. Due to this wrongful inducement, Mr. Lamey, very similarly to the putative members of the Inducement/Origination Class, incurred a private student loan balance, well into six-figures, that cannot possibly be repaid. Plaintiff, like the Inducement/Origination Class Members, has been confined to a life of student-loan-poverty as a result of the fraudulent-inducement of these private student loans by Sallie Mae (now Navient).

18.     Plaintiff's substantial contacts with all Defendants in this matter occurred from his (former) home: at 5428 Jamaica Drive, Jackson, Mississippi 39211.

19.     Further, Plaintiff, like the Navient-Serviced Student Loan Class Members, has suffered violations of the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Telephone Consumer Protection Act, the Consumer Financial Protection Act of 2010, and related common law violations at the hands of SLM, Inc., d/b/a Sallie Mae, the Navient Corporation, and Navient Solutions, Inc, as it relates to the servicing and collection of these Sallie Mae/Navient student loans. These willful, or grossly-negligent, violations have caused Plaintiff, and the Navient-Serviced Student Loan Class Members, severe damages.

20.     Also, Plaintiff, similar to the Attorney and Law Firm Class Members, has suffered damages as a result of the legal malpractice, or fraud, inflicted by the Attorney and Law Firm Defendants' so-called "private student loan debt resolution" legal services, which, at best, is gross legal malpractice, and, at worst, is a scam and a fraud perpetuated and solicited by licensed Florida attorneys, Kevin Mason and his law partners, Chantel Grant, against desperate persons – like Plaintiff and the Attorney and Law Firm Class Members – who have been saddled with unmanageable private student loan debt-loads, and who are susceptible for being taken advantage of by attorneys like Kevin Mason and Chantel Grant.

*(The Defendants)*

21.     First-named Defendant(s), Navient Solutions, LLC ("Navient"), d/b/a the Navient Corporation, has been formerly known as: Sallie Mae, Inc., Sallie Mae, and Navient Solutions, Inc. Navient is a Delaware limited liability company with its principal offices located in Reston, Virginia. Navient is registered with the Mississippi Secretary of State's Office as a foreign corporation authorized to conduct business in the State of Mississippi. principally engages in servicing of federal and private student loans for more than 12 million

borrowers. At all times material to this complaint, Navient Solutions, Inc. has offered or provided a "consumer financial product or service," and therefore is and was a "covered person" under the CFPA. 12 U.S.C. § 5481(6), (15)(A)(i). At all times material to this Complaint, Navient has been located and transacted business in this judicial district.

22.     Navient (via its current holding/parent company, Navient Solutions, LLC) may be served with process via its registered agent with the Mississippi Secretary of State: Corporation Service Company, 5760 I-55 North, Suite 150, Jackson, Mississippi 39211.

23.     Navient, at all times material to this Complaint, engaged in debt collection activities related to outstanding and delinquent student loans on behalf of several owners of federal student loans. Thus, the Navient Defendants are a "debt collector(s)" under the FDCPA. 15 U.S.C. § 1692a(6).

24.     Following a corporate reorganization in 2014, Navient Corporation was the successor to SLM, Inc., d/b/a Sallies Mae, and Navient, LLC. As part of this reorganization, Navient Corporation assumed certain liabilities related to the servicing and collection activities of SLM, Inc. d/b/a Sallie Mae, Navient, LLC, and their subsidiaries. Among the liabilities assumed by Navient Corporation are all of the pre-reorganization inducement,, origination, servicing, and collection conduct described in this Complaint.

25.     SLM, Inc., d/b/a Sallie Mae, was awarded the servicing-contract with the U.S. Department of Education in 2009, and that contract continues to be in force to the present (subject to various modifications that the parties to that contract have executed). All documents related to that contract were signed in the name of SLM, Inc. (or Corporation), or, subsequently, Navient, LLC. Accordingly, as a result of the 2014 corporate

reorganization, Navient Corporation (via its holding/parent company, Navient Solutions, LLC), is currently the entity that contracts with the U.S. Department of Education for the servicing of federal student loans, as well as being a main third-party servicer and collector of private student loan debt throughout the United States.

26.     In public statements, including annual 10-K filings with the U.S. Securities and Exchange Commission, Navient Corporation (including its predecessor SLM, Inc.) has boasted about its capabilities with respect to student loan servicing and collection, including helping consumers navigate the path to financial success and select the appropriate payment plan for their circumstances. Navient Corporation has also indicated that it is responsible for overseeing the strategic direction and business goals of its subsidiaries. For instance, Navient Corporation's 2015 10-K filing includes the following statements:

- "Navient [Corporation] is the nation's leading loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success. Servicing more than $300 billion in education loans, Navient [Corporation] supports the educational and economic achievements of more than 12 million customers."

- "Navient [Corporation] services loans for more than 12 million … customers, including 6.3 million customers whose accounts are serviced under Navient [Corporation]'s contract with ED. We help our customers navigate the path to financial success through proactive outreach and emphasis on identifying the payment plan that best fits their individual budgets and financial goals."

- "The Navient [Corporation] board of directors and its standing committees oversee our strategic direction, including setting our risk management philosophy, tolerance and parameters; and establishing procedures for assessing the risks our businesses face as well as the risk management practices our management team develops and implements."

- "Each business area within our organization is primarily responsible for managing its specific risks following processes and procedures developed in

collaboration with our executive management team and internal risk management partners."

27.     Navient Solutions, LLC, d/b/a Navient Corporation consented to, has knowledge of, has materially participated in, and has controlled the activities of Navient Solutions, Inc. and all other relevant Navient predecessor or subsidiary business entities material to the facts pleaded in this Complaint.

28.     Second-named Defendant, Kevin Mason, P.A., is a Florida corporation that offered professional legal services to the public. This business entity has never been registered to conduct business within Mississippi with the Mississippi Secretary of State's Office. Florida attorney, Kevin Mason, is the registered agent of Kevin Mason, P.A.

29.     Third-named Defendant, GM Law Firm, LLC, is a Florida limited liability company that offers professional legal services to the public. This business entity has never been registered to conduct business within Mississippi with the Mississippi Secretary of State's Office. This law firm is owned and operated by Florida attorneys, Kevin P. Mason and Chantel L. Grant. Chantel L. Grant, is the registered agent of GM Law Firm, LLC. It principal place of business is: 1515 South Federal Highway, Suite 105, Boca Raton, Florida 33432.

30.     Fourth-named Defendant, Kevin P. Mason, individually, is a Florida attorney. Kevin Mason is an owner and principal of Kevin Mason, P.A., and GM Law Firm, LLC, along with his law partner, Chantel L. Grant. Kevin Mason may be served at: 1515 South Federal Highway, Suite 105, Boca Raton, Florida 33432.

31.     Fifth-named Defendant, Chantel L. Grant, individually, is a Florida attorney. Upon information and belief, Chantel Grant is an owner and principal of Kevin Mason,

P.A., and GM Law Firm, LLC, along with her law partner, Kevin P. Mason. Chantel Grant may be served at: 1515 South Federal Highway, Suite 105, Boca Raton, Florida 33432.

## JURISDICTION

32.     This is a class action.

33.     Plaintiff and other members of the (three) Proposed Classes are citizens of states different from the home state of Defendants. Complete diversity of state citizenship exists in this suit. Further, and as a separate, independent basis for this Court's jurisdiction in this matter, questions of federal law pertaining to the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565; the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681 *et seq.*, and its implementing regulation, Regulation V, 12 C.F.R. part 1022; the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 *et seq.*; and the Telephone Consumer Protection Act (TCPA), 47 U.S.C. §§ 227 *et seq.*, are raised by the filing of this Complaint.

34.     On information and belief, aggregate claims of individual Class Members exceed $35,000,000.00 in value, exclusive of interest and costs.

35.     Jurisdiction is proper in this Court pursuant to both 28 U.S.C. § 1332(d) and 28 U.S.C. 1331.

## VENUE

36.     The Defendants, through their intentional business activities with Plaintiff in Jackson, Hinds County, Mississippi, have established sufficient contacts in this district such that personal jurisdiction is appropriate. All Defendants are deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

37.     In addition, a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

38.     Venue is proper in this Court under 28 U.S.C. § 1391(a).

## FACTS

**Navient/Sallie Mae's material misrepresentations, or concealment of material facts, in order to induce high-risk borrowers, like Plaintiff and Inducement/Origination Class Members, to take out private, and federal, student loans were not truthful, nor were they in the best financial interests of the borrowers. (Violations of the Truth in Lending Act and other Common Law Torts).**

39.     Since the early 2000's, Navient, d/b/a Sallie Mae, has failed to disclose material financial information and data to its prospective private student loan borrowers regarding the legitimate, and true, financial prospects of many degree programs – including the program of Plaintiff in philosophy an religious studies from private Millsaps College – in an attempt to wrongly-induce these high-risk borrowers to finance their undergraduate studies by entering into lucrative promissory-note-agreements with Navient d/b/a Sallie Mae that cannot possibly be repaid, that ultimately caused the ruination of Plaintiff and Inducement/Origination Class Member's credit histories, and that have led to a serious of other financial calamities for Plaintiff and the Inducement/Origination Class Members, the damages of which shall be determined by the jury at trial.

40.     As a result of the intentional, or grossly-negligent, concealment of material facts, and the related fraud-in-the-factum by the Navient Defendants, Plaintiff and the Inducement/Origination Class Members make demand for the following: recession of all Navient/Sallie Mae private student loan promissory notes that were induced by fraud or material misrepresentations or omissions, as described in this Complaint; all economic

damages suffered as a result of these wrongful acts by the Navient Defendants; all consequential damages suffered as a result of these wrongful acts by the Navient Defendants; all statutory damages permitted by law; all attorney's fees; all costs of litigation; and an award of punitive damages, to be determined by the jury at trial.

41.    Navient d/b/a Sallie Mae violated The Truth in Lending Act (TILA), 15 U.S.C. § 1601, *et. seq.*, as amended, and various common law duties it owed to Plaintiff, and the Inducement/Origination Class Members, when it failed to disclose material financial information and data to its prospective private student loan borrowers regarding the legitimate, and true, financial prospects of many degree programs in an attempt to wrongly-induce these high-risk borrowers to finance their undergraduate studies by entering into lucrative promissory-note-agreements with Navient d/b/a Sallie Mae that cannot possibly be repaid, that ultimately caused the ruination of Plaintiff and Inducement/Origination Class Member's credit histories.

**Navient's Steering of Borrowers Experiencing Long-Term Financial Hardship, like Plaintiff and the Navient-Serviced Student Loan Class Members, into Forbearance when doing so is not in their best financial interests.**

42.    Upon first entering repayment, a federal student loan borrower is assigned to or selects a specific repayment plan. However, that borrower has the right to change his/her repayment plan assignment or selection at any time, including if the borrower is experiencing financial hardship or distress.

43.    The U.S. Department of Education offers numerous repayment plans to eligible borrowers with federal student loans, which are designed to help borrowers manage their student loan debt and make monthly repayment of these loans more affordable. These

repayment plans include several income-driven repayment plans, such as Income-Based Repayment (IBR) and Pay As You Earn Repayment (PAYE).

44.     Most federal student loans, like those of Plaintiff and the Navient-Serviced Student Loan Class Members, are eligible for at least one income-driven repayment plan.

45.     The monthly amount that the borrower will pay under the income-driven repayment plans is set at an amount that is intended to be more affordable based on the borrower's income and family size.

46.     Depending on the borrower's income and family size, a borrower's monthly payment may be as low as $0 per month when enrolled in an income-driven repayment plan.

47.     In addition to providing a more affordable monthly payment, most income-driven repayment plans offer several other benefits for federal student loan borrowers, especially borrowers experiencing long-term financial hardship. For example, for borrowers with subsidized loans whose monthly payment amount does not fully cover accrued interest, the federal government will pay any remaining unpaid interest that accrues on those loans during the first three consecutive years of enrollment in the plan. This interest subsidy can be a significant benefit to such borrowers because they generally have no obligation to ever pay the remaining unpaid interest that accrues during those three years. Furthermore, because that unpaid interest is paid in full by the federal government, it is not added to the principal balance of the loan. When interest is not paid, it can be added to the principal balance of the loan; additional interest is then charged on the increased principal balance of the loan, which could significantly increase the total amount repaid over the life of the loan. Thus, the interest subsidy available to many borrowers enrolled in income-driven repayment

plans can reduce these additional harmful effects, mitigating the financial strain on those borrowers.

48.     Another benefit available to borrowers who are enrolled in an income-driven repayment plan is forgiveness of the remaining balance of their federal loan, either after making 20-25 years of qualifying payments for most income-driven repayment plans or 10 years of qualifying payments while working full time for certain public service employers.

49.     Federal student loans are generally also eligible for forbearance, which is a short-term, temporary postponement of payment. With forbearance, a borrower experiencing financial hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined period of time.

50.     Navient's Web site states that forbearance is appropriate for borrowers who "have a problem making on-time payments due to a temporary financial difficulty." The website also states: "Forbearance is intended to help you out in times of temporary need."[6]

51.     Forbearance is typically not suitable for borrowers experiencing financial hardship or distress that is not temporary or short-term. Borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance. These include the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance of the loan. In addition, in some cases, following a forbearance, a loan may be re-amortized, where the monthly payments may be recalculated, which can lead to an increase in the borrower's monthly payment amount. As a result of these costs, long-term enrollment in forbearance can dramatically increase the total amount

---

[6] Navient, *Deferment and Forbearance*, https://www.navient.com/loancustomers/postponing-payments/deferment-and-forbearance/ (last visited Jan. 21, 2017).

due each month after the forbearance period ends and over the repayment term for a borrower's, like Plaintiff's and the Navient-Serviced Student Loan Class Members' federal loans.

52.     Because income-driven repayment plans enable borrowers to avoid or reduce these costs associated with forbearance, for borrowers whose financial hardship is not temporary and short-term, enrolling in an income-driven repayment plan is usually a significantly better option than forbearance.

53.     The U.S. Department of Education has publicly encouraged borrowers to consult their federal student loan servicer to determine the best repayment option or alternative for that individual borrower. In several places on its website, the U.S. Department of Education has advised borrowers to contact their student loan servicer before applying for any alternative repayment plan or forbearance, with statements such as the following: "Work with your loan servicer to choose a federal student loan repayment plan that's best for you";[7] "Before you apply for an income driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you";[8] and "Always contact your loan servicer immediately if you are having trouble making your student loan payment."[9]

54.     Likewise, Navient, as a servicer of federal loans, has repeatedly encouraged borrowers experiencing financial hardship, like Plaintiff and the Navient-Serviced Student

---

[7] Federal Student Aid, U.S. Department of Education, *Repayment Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans (last visited Jan. 21, 2017).

[8] Federal Student Aid, U.S. Department of Education, *Income-Driven Repayment Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited Jan. 21, 2017).

[9] Federal Student Aid, U.S. Department of Education, *Deferment and Forbearance*, https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance (last visited Jan. 21, 2017).

Loan Class Members, to contact Navient for assistance in evaluating the various alternative repayment options. For example, Navient's website has included the following statements inviting borrowers to contact Navient for guidance in finding long-term repayment solutions:

- "[I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default …. We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800-722-1300 and *let us help you make the right decision for your situation.*"[10]

- "If you're experiencing problems making your loans payments, please contact us. *Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation.*"[11]

- "*Navient is here to help.* We've found that, 9 times out of 10, when we can talk to a struggling federal loan customer we can help him or her get on an affordable payment plan and avoid default."[12]

55.     For many years, Navient's website has included other, similar statements relied upon by Plaintiff and the Navient-Serviced Student Loan Class Members. For example, its website previously stated that it was "committed to giving you the information and tools you need to understand and evaluate your student loan payment options. *We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost.*" (emphasis added).

56.     Nevertheless, since at least July 2011, despite publicly assuring borrowers, like Plaintiff and the Navient-Serviced Student Loan Class Members, that it will help them identify and enroll in an appropriate, affordable repayment plan, Navient has routinely

---

[10] Navient, *If You're Having Trouble*, https://www.navient.com/loan-customers/postponing-payments/if-you-are-having-trouble/ (last visited Jan. 21, 2017) (emphasis added).
[11] Navient, *Avoiding Delinquency and Default*, https://www.navient.com/loancustomers/postponing-payments/avoiding-default/ (last visited Jan. 21, 2017) (emphasis added).
[12] Navient, *5 Habits of Successful Borrowers*, https://www.navient.com/loancustomers/getting-started/successful-student-loan-borrowers/ (last visited Jan. 21, 2017) (emphasis added).

disregarded that commitment and instead steered borrowers experiencing long-term distress or hardship, like Plaintiff and the Navient-Serviced Student Loan Class Members, into forbearance.

57.     Navient's compensation policies for its customer service representatives have incentivized them to push numerous borrowers to forbearance without adequately exploring income-driven repayment plans with those borrowers, and in some cases, without even mentioning income-driven repayment plans at all.

58.     Because of the number and complexity of repayment options available for federal loans, a conversation about alternative repayment plans and the borrower's financial situation is usually time-consuming and cumbersome.

59.     Navient, however, has compensated its customer service personnel, in part, based on average call time. As a result, engaging in lengthy and detailed conversations with borrowers about their particular financial situation and trying to determine the income-driven repayment plan that is most appropriate for each borrower would have been financially detrimental for those employees.

60.     Moreover, since a borrower is required to submit a paper or online application, and include certain income tax documentation with that application, to enroll in an income-driven repayment plan, the process of enrolling a borrower in such plans sometimes requires multiple, lengthy conversations with the borrower. This is especially true considering that more than half of Navient borrowers who enroll in income-driven repayment plans for the first-time report that they could not navigate the application process on their own.

61.     In addition to the paperwork required to enroll a borrower in an income-driven repayment plan, a borrower in such a plan must also complete an annual recertification form each year to document his/her current income and family size, which is then used to adjust the borrower's payment amount. Processing this renewal paperwork further increases the employee time that Navient must devote to borrowers who enroll in an income-driven repayment plan.

62.     As the volume of income-driven repayment plan applications and renewals received by Navient increases, Navient also must increase the size of its staff to review and process those forms, thereby increasing operating costs.

63.     In sum, counseling borrowers, like Plaintiff and the Navient-Serviced Student Loan Class Members, about, and enrolling those borrowers in income-driven repayment plans, is costly for Navient and its employees.

64.     In contrast, enrollment in forbearance can often be completed over the phone, in a matter of minutes, and generally without the submission of any paperwork.

65.     As compared to the staff resources and time expenditure required to enroll and renew borrowers in income-driven repayment plans, enrolling borrowers in forbearance is substantially less expensive for Navient and is or was financially beneficial for its employees. Navient employees have routinely failed to invest the time and effort necessary to help financially distressed borrowers, like Plaintiff and the Navient-Serviced Student Loan Class Members, to identify and enroll in the affordable repayment plans most appropriate for their financial situation.

66.     According to the Consumer Financial Protection Bureau (CFPB), between

January 2010 and March 2015, the number of borrowers that Navient enrolled in

forbearance has generally exceeded the number of borrowers enrolled in income-driven

repayment plans. For example, in December 2010, around 9% of borrowers with Federal

Family Education Loan (FFEL) loans held and serviced by Navient were enrolled in

voluntary forbearance, while less than 1% of borrowers with the same loan type were

enrolled in IBR. Similarly, in December 2012, approximately 7% of Navient borrowers with

FFEL loans held and serviced by Navient were enrolled in voluntary forbearance, while just

2% of borrowers with the same loan type were enrolled in IBR.

67.     Navient representatives sometimes initially responded to borrowers' inability

to make a payment by placing them in voluntary forbearance without adequately advising

them about available income-driven repayment plans. This occurred even though it is likely

that a large number of those borrowers would have qualified instead for a $0 payment in an

income-driven repayment plan at that time. Indeed, over 50% of Navient borrowers, like

Plaintiff and the Navient-Serviced Student Loan Class Members, who need payment relief,

and meet the eligibility criteria for income-driven repayment plans, would likely qualify for a

very low – if not $0 – monthly payment.

68.     For example, between January 1, 2010 and March 31, 2015, nearly 25% of

borrowers who ultimately enrolled in IBR with a $0 payment were enrolled in voluntary

forbearance within the twelve-month period immediately preceding their enrollment in IBR.

Similarly, during that same time period, nearly 16% of borrowers who ultimately enrolled in

PAYE with a $0 payment were enrolled in voluntary forbearance within the twelvemonth

period immediately preceding their enrollment in PAYE. The majority of these borrowers were enrolled in voluntary forbearance more than three months prior to their enrollment in the income-driven repayment plan, which suggests that forbearance was not merely offered to these borrowers while their application in an income-driven repayment plan was pending. Because they were placed into forbearance before ultimately enrolling in an income-driven repayment plan with a $0 payment, these borrowers had delayed access to the benefits of the income-driven repayment plan. They were also subject to the negative consequences of forbearance, including the addition of interest to the principal balance of the loan, which they potentially could have avoided had they been enrolled in the income-driven repayment plan from the start.

69.    Navient also enrolled an immense number of borrowers in multiple consecutive forbearances, even though they had clearly demonstrated a long-term inability to repay their loans. For example, between January 1, 2010 and March 31, 2015, Navient enrolled over 1.5 million borrowers in two or more consecutive forbearances totaling twelve months or longer. More than 470,000 of these borrowers were enrolled in three consecutive forbearances, and more than 520,000 of them were enrolled in four or more consecutive forbearances. For borrowers enrolled in three or more consecutive forbearances, each forbearance period lasted, on average, six months. Therefore, hundreds of thousands of consumers were continuously enrolled in forbearance for a period of two or three years, or more. Regardless of why these borrowers did not enroll in an income-driven repayment plan from the start, their long-term inability to repay was increasingly clear as each forbearance period expired. Yet Navient representatives continued to enroll them in forbearance again

and again, rather than an income-driven repayment plan that would have been beneficial for many of them.

70.     Enrollment in multiple consecutive forbearances imposed a staggering financial cost on this group of borrowers. At the conclusion of those forbearances, Navient had added nearly four billion dollars of unpaid interest to the principal balance of their loans. For many of these borrowers, had they been enrolled in an income-driven repayment plan, they would have avoided much or all of their additional charges because the government would have paid the unpaid interest on their subsidized loans in full during the first three years of consecutive enrollment.

**Navient's (Repeated and Knowing) Violations of the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Telephone Consumer Protection Act, and the Consumer Financial Protection Act of 2010.**

71.     Navient has violated the above federal consumer protection laws as relates to Plaintiff, and the Navient-Serviced Student Loan Class Members, as follows: repeated unlawful debt-collection telephone calls to telephone numbers that were never provided to Navient, nor in which Navient was authorized by the borrowers to contact them at said telephone numbers (in the case of Plaintiff, Mr. Lamey, more than 80 unauthorized and unlawful collection-calls were made to a cellular telephone of Mr. Lamey's that was never provided to Navient at the time of these more than 80 unlawful collection-calls); other unauthorized and unlawful collection activities and communications from Navient to Plaintiff and the Navient-Serviced Student Loan Class Members; unlawful and malicious reports made by Navient to the major third-party credit-reporting-bureaus containing incorrect negative items about Plaintiff and the Navient-Serviced Student Loan Class

Members payments histories on their Navient-serviced (federal and private) student loans,
etc., which are subject to recession in the first place, considering the fraud, concealment, and
misrepresentations central to the inducement of Plaintiff and the Inducement/Origination
Class Members to take out these student loans (specially private student loans) in the first
place.

72.     An illustrative, but not exhaustive, list of the unlawful debt-collection
telephone calls received by Plaintiff, and that were made by Navient to a number never
disclosed to Navient[13], is attached, and incorporated into, this Complaint as Collective
Exhibit "1". Plaintiff is entitled to statutory damages, attorney's fees, costs of litigation, and
punitive damages as a result of these intentional and malicious FDCPA, TCPA, FCRA, and
CFPA violations on the part of Navient.

73.     Some written debt-collection correspondence from Navient, or Navient's
distressed-debt collection subsidiary, Asset Recovery Solutions, LLC, demonstrating
Navient's failure to disclose the appropriate IBR programs (or other debt-relief programs) to
Plaintiff are attached to, and incorporated into, this Complaint as Collective Exhibit "2".
Further, many of these collection communications were not even sent to Mr. Lamey, but
instead, were directed toward Mr. Lamey's mother, Margaret A. Lamey, of Gulfport,
Mississippi.

**Navient's Servicing Failures Relating to Renewal of Borrowers' Enrollment in Income-Driven Repayment Plans.**

74.     A federal student loan borrower who is enrolled in an income-driven
repayment plan must certify his/her income and family size to qualify for an affordable

---

[13] This telephone is: 769-226-4199.

payment amount that is based on that income and family size. This affordable payment amount applies for a period of twelve months. At the end of this twelve-month period, the affordable payment amount will expire unless the borrower renews his/her enrollment in the plan before the expiration date. To do so, the borrower must "recertify" his/her income and family size by submitting updated information, including documentation of income. The borrower must recertify income and family size information before the expiration of the twelve-month period each year in order to maintain the affordable payment amount each year.

75.     If the twelve-month period expires because the borrower has not timely recertified income and family size, several negative consequences are likely to occur. First, the borrower's monthly payment amount may immediately increase from a low affordable amount to one that is typically in the hundreds or even thousands of dollars.

76.     Other significant consequences that will occur when the twelvemonth period expires without a timely recertification include (1) the addition of any unpaid, accrued interest to the principal balance of the loan; (2) for subsidized loans in the first three years of enrollment in an income-driven repayment plan, the loss of an interest subsidy from the federal government for each month until the borrower renews his/her enrollment; and (3) for some borrowers who enroll in forbearance when the twelve-month period expires, delayed progress towards loan forgiveness because the borrower is no longer making qualifying payments that count towards loan forgiveness. These consequences are all irreversible.

77.    At the time of enrollment in the income-driven repayment plan, Navient has

sent borrowers, including Plaintiff and the Navient-Serviced Student Loan Class Members,

an "initial disclosure notice" which identified the beginning and end dates of the initial

enrollment in the repayment plan. That notice has also advised consumers: "You'll be

notified in advance when your loan(s) is up for renewal for the [income-driven repayment]

plan. At that time, you'll be provided with a date to submit a new application." However, the

notice has not indicated any specific renewal deadline.

78.    The "initial disclosure notice" has also outlined certain consequences that

might result if the borrower "chooses not to renew" or "requests to leave the plan,"

including the recalculation of the borrower's monthly payment amount and the addition of

unpaid interest to the principal balance of the loan. This indicates that these consequences

will result only if the borrower either "chooses not to renew" or "requests to leave the plan."

The notice does not identify any consequences that might result if the borrower – like

Plaintiff and the Navient-Serviced Student Loan Class Members – chooses to renew by

submitting a renewal application, but the application is incorrect or incomplete in some

respect or is not submitted in a timely manner.

79.    Since at least January 1, 2010, federal student loan servicers, including

Navient, have been required to send at least one written notice concerning the annual

renewal requirements to borrowers in advance of their renewal deadline.

80.    From at least January 1, 2010, until December 2012, Navient's annual renewal

notices for income-driven repayment plans sent through U.S. mail did not inform borrowers

of the actual date by which they had to submit the renewal application, including

documentation of income, to avoid expiration of the twelve-month period during which payment was set at an affordable amount based on the borrower's income and family size.

81.    Instead, Navient's pre-December 2012 notices stated vaguely that the borrower's income-based repayment period would "expire in approximately 90 days" and that the "renewal process may take at least 30 days."

82.    It is impossible to determine from these two statements the deadline by which a borrower must submit the required documentation and information in order to timely renew enrollment in the plan. First, the statement that the "renewal process may take at least 30 days" says nothing about how long the renewal process will actually take, or even the maximum number of days the renewal process could take.  Second, by saying that the plan would expire in "approximately 90 days," Navient provided no date by which the borrower could count backwards to calculate the deadline – even if Navient had told the borrower how many days to count (which it did not). The notice also failed to advise borrowers – like Plaintiff and the Navient-Serviced Student Loan Class Members – of the likely consequences if they failed to timely submit their renewal application.

83.    The pre-December 2012 notices also failed to advise borrowers of the likely consequences of submitting incorrect or incomplete information. The notices encouraged borrowers to fill out the forms completely and warned borrowers that "by providing incorrect or incomplete information the [renewal] process will be delayed." This falsely implied that the only consequence of providing incorrect or incomplete information was a "delay" in the renewal "process" – that while the renewal *process* would be delayed by the

submission of an incomplete and incorrect application for renewal, as long as the
deficiencies were rectified, no other consequences would result.

84.     Borrowers who have submitted a renewal application have clearly chosen to
renew their enrollment; their choice to renew was evidenced by their submission of the
application, even if that application was incomplete or inaccurate in some respect. But the
pre-December 2012 notice said nothing to warn these borrowers that failing to submit
complete and accurate information before the end of the twelve-month period would have
essentially the same consequences as if the borrower chose not to renew their enrollment in
the income-driven repayment plan at all, because the consequences of a decision not to
renew that were outlined in the initial disclosure letter would still result. Those consequences
included at least a temporary increase in the borrower's monthly payment amount, the
addition of any unpaid interest to the principal balance of the loan, and other financial
consequences described above. Borrowers could not reasonably have been expected to
interpret Navient's reference to a mere processing delay to actually mean irreversible
financial harm.

85.     For borrowers who have consented to receiving electronic communications,
Navient has sent electronic renewal notices instead of hard copy notices by mail. More than
75% of Navient's federal student loan borrowers have consented to receiving electronic
communications.

86.     Between at least mid-2010 and March 2015, these borrowers had to log in to
Navient's secure website with their user ID and password to view an electronic version of

the renewal notice sent via U.S. mail to other borrowers. Navient, however, failed to adequately advise these borrowers of the availability of the electronic notice on its website.

87.     The only step that Navient took to advise these borrowers of the availability of the electronic notice on its website was to send them an email with a hyperlink to its website, where the renewal notice could be viewed after the borrower logged into his/her secure account. But neither the subject line of this email nor its contents provided any indication of the purpose of the notice.

88.     From at least January 1, 2010 through November 15, 2012, the subject line of the email simply read: "Your Sallie Mae Account Information." Likewise, from at least November 16, 2012 through March 18, 2015, the subject line of the email was: "New Document Ready to View."

89.     The body of the email did not provide any greater detail. Until mid-2015, the body of the email stated only that "a new education loan document is available. Please log in to your account to view it."

90.     In stark contrast, during the same time period, other emails sent by Navient described the content or purpose of the referenced document. For example, the subject line of one such email was "Your Sallie Mae – Department of Education Statement is Available," and the body of the email stated "Your monthly statement is now available. Please log in to your account at SallieMae.com to view and pay your bill." Another email regarding loan terms had a subject line that read "Change in Loan Terms," and the text of this email stated, "The payment term for your loan(s) has changed. Please log in to your account to view the document with your updated payment schedule."

91.     Navient has tracked the number of borrowers who click on the hyperlink in the emails that Navient sends to them. Thus, Navient has known or should have known that many borrowers did not view the electronic renewal notices.

92.     Between at least July 2011 and March 2015, the percentage of borrowers who did not timely renew their enrollment in income-driven repayment plans regularly exceeded 60%. Those borrowers who did not timely renew experienced the significant consequences of nonrenewal, including a payment jump and the addition of any accrued, unpaid interest to the principal balance of the loan.

93.     Navient has been aware that the majority of borrowers were failing to renew their enrollment in income-driven repayment plans.

94.     Beginning in or around March 2015, Navient made several enhancements to its email that provides access to the electronic renewal notice. It changed the subject line of the email to read "Your Payment Will Increase Soon!" and the text of the email now states: "[I]n order to keep your lower payment amount, it's important that you apply soon to renew your repayment plan."

95.     Since Navient made these enhancements to its electronic notices, the renewal rate has more than doubled.

**Navient's Misrepresentations Relating to Cosigner Release(s)**

96.     A cosigner is generally necessary for a borrower to obtain a private student loan, or to obtain that loan with more favorable terms. This was the case for Plaintiff, Mr. Lamey, whose mother, Margaret A. Lamey, acted as his cosigner on his private student loans at issue in this class action lawsuit.

97.     Once a borrower enters repayment on his/her private student loan, he or she generally can apply to release the cosigner from the loan after meeting certain eligibility criteria. This option is generally available to most Navient borrowers with cosigned private student loans.

98.     Since at least January 2010, one of the eligibility criteria that Navient has required private student loan borrowers, like Plaintiff, to meet before they can apply to release a cosigner is that the borrower must make a minimum number of consecutive, on-time payments consisting of both principal and interest. Since January 21, 2014, Navient has required the borrower to "make 12 consecutive, on-time principal and interest payments" before applying for cosigner release. Prior to January 21, 2014, and depending on the applicable terms of the borrower's loan, Navient required borrowers to make between 12 and 48 "consecutive, on-time principal and interest payments" before applying for cosigner release. Navient did not, however, specifically define for borrowers what it meant by "consecutive" or "ontime" payments.

99.     A borrower in repayment will sometimes make a payment that is a multiple of the monthly payment amount due. For example, a borrower whose monthly payment amount due is $100 may choose to pay $200 or $300 instead of $100.

100.     When a borrower makes such a "multiplier overpayment," Navient generally applies the payment to satisfy the borrower's current monthly payment due, and then places the borrower in a "paid ahead" status for the subsequent months that have been satisfied by the excess payment.

101.    For each month that the borrower is in a "paid ahead" status on his/her private student loan, Navient sends the borrower a bill indicating that the payment due for that month is $0 because the borrower is not required to make any payment that month in order to remain current on his/her loan. Thus, there is no "on-time principal and interest payment" that is even due that month.

102.    Until at least mid-2015, in determining whether a borrower made the minimum number of "consecutive, on-time principal and interest payments" for purposes of cosigner release, Navient treated the lack of payment by a borrower in response to a $0 bill as a failure to make a "consecutive, on-time principal and interest payment" that month. Navient reset the borrower's progress towards the "consecutive, on-time principal and interest payments" requirement to zero months.

103.    For example, suppose a borrower's monthly amount due is $100. If she paid exactly $100 each month from January through September 2014, Navient would have considered her to have made nine consecutive, on-time payments. Suppose she then submitted a $200 payment in October 2014. Because that $200 payment would have been enough to cover the monthly amount due for both October and November 2014, she would have received a $0 bill for November. Because no payment was required by the $0 bill, she submitted no payment in November. Then, in December 2014, upon receiving the next bill that actually required a payment, she made an on-time monthly payment of $100. Because she did not submit a payment in November 2014, Navient would have reset her progress toward the consecutive, on-time principal and interest payment requirement for cosigner

release. Navient would have treated this borrower as having made zero consecutive payments as of November.

104.    This is contrary to Navient's statement to borrowers that they can apply for cosigner release if they make a certain number of "consecutive, on-time principal and interest payments." The requirement is only that the "on-time principal and interest *payments*" must be consecutive – not that the "months" or "billing cycles" in which on-time principal and interest payments are made must be consecutive. The requirement does not even refer to months or billing cycles.

105.    When a borrower does not submit a payment in a particular month because he/she has received a $0 bill as a result of a previous multiplier overpayment, and then makes an on-time principal and interest payment the next time he/she receives a bill for more than $0, there is no break in eligible payments that he/she has made towards the on-time principal and interest payment requirement. The borrower in the example above made eleven eligible payments in 2014, and they were consecutive because there was no "on-time principal and interest payment" she failed to make that year. Yet Navient would have reset her count to zero months in November 2014 because her payments were not made in consecutive months.

106.    Navient has thus misled borrowers – like Plaintiff and the Navient-Serviced Student Loan Class Members – by stating that they must make twelve "consecutive, on-time principal and interest payments" before applying for cosigner release. The actual requirement that Navient applied is that the borrower must submit a separate on-time payment in each of

twelve consecutive months amounting to at least the regular principal and interest amount, even where the billing statement indicates that no payment is required.

107.   Navient failed to disclose this actual requirement. And nothing on Navient's billing statement, its website, or any other consumer-facing document advised borrowers that making no payment in response to a $0 bill could impact their eligibility for cosigner release.

108.   By resetting borrowers' progress toward the "consecutive, ontime principal and interest payments" requirement to zero months when they submitted no payment in response to a $0 bill as a result of a previous multiplier overpayment, Navient denied or delayed cosigner release for borrowers who had already satisfied the requirement that Navient had disclosed or had made progress towards doing so, and who had met or would have been able to meet Navient's other requirements for release.

**Navient's Payment Processing Errors**

109.   One of Navient's primary responsibilities as a student loan servicer is to process payments made by borrowers and cosigners on their student loan accounts.

110.   Navient, however, does not have adequate processes and procedures in place to sufficiently address certain errors it makes in the processing of payments received from borrowers and cosigners or to prevent errors from recurring.

111.   A significant number of borrowers and cosigners do not submit payments through Navient's online portal, but instead submit their payments by mailing a check or through an external bill payment system (such as a bill payment service operated by the bank where the borrower has a checking account).

112.    Since at least July 2011, many borrowers and cosigners, like Plaintiff and the Navient-Serviced Student Loan Class Members – and primarily those who pay by mailing a check or through an external bill payment system – have complained that Navient misallocated or misapplied submitted payments. (Errors in the allocation of payments relate to how a payment is distributed across multiple loans. Errors in the application of payments relate to how a payment is applied to a specific loan or loans based on the terms of each loan's promissory note; for example, the payment might be applied first to unpaid fees, then to unpaid interest, and then to unpaid principal.)

113.    By way of example, in some instances, Navient has misallocated payments intended and/or designated for a specific loan(s) among some or all of a borrower's other loans. Sometimes, the payment was a lump sum payment intended to pay off a specific loan, but Navient allocated the payment to all of the loans in the borrower's account, thereby not paying off the loan that the borrower intended to pay off. In other cases, Navient has disregarded borrower or cosigner instructions about how to divide a payment among loans, or incorrectly allocated payments made by cosigners to all of the loans in the borrower's account instead of only the loans which they cosigned.

114.    Each year Navient receives thousands of complaints and inquiries relating to payment misapplication or misallocation that are escalated beyond a first-level customer service representative.

115.    One source for payment processing errors appears to be the undisclosed payment allocation methodology used by Navient. Specifically, when a borrower has more than one loan serviced by Navient, Navient generally places that borrower's loans in one or

more billing groups. For borrowers who made a payment that varied from the exact amount owed on the loans in a billing group, Navient has used a default allocation methodology that was not disclosed on any billing statement, promissory note, or printed or online resource available to borrowers.

116.    In addition, the default allocation methodology varied based on whether the loan was federal or private, as well as whether the borrowed submitted an underpayment, overpayment, or an overpayment that was a multiple of the borrower's monthly payment amount due.

117.    Because Navient did not make its default allocation methodologies clear or publicly available until at least late 2013, prior to that time borrowers and cosigners had no way of knowing in advance how Navient might allocate payments (unless they specifically requested the information and a representative provided accurate information).

118.    While a borrower or cosigner could submit written instructions with a paper check as to how a payment should be processed, Navient's mail reading equipment did not always properly detect the presence of such instructions. And even where the instructions were detected and acted upon by a Navient representative, the Navient representative did not always implement the instructions properly.

119.    Thus, borrowers who did not use Navient's online portal to submit payments had to call if they discovered, as was sometimes the case, that their payment processing instructions had not been honored or had not been implemented properly.

120.    Errors made by Navient in the processing of payments received from borrowers and cosigners have resulted in borrowers and cosigners incurring improper late

fees, increased interest charges, the furnishing of inaccurate negative information to consumer reporting agencies, and the loss of certain benefits.

121.   Many borrowers and cosigners have complained that a payment processing error was not an isolated event, but rather that the same payment processing error recurred time and again, even after they contacted Navient to correct the error.

122.   While Navient might correct a specific error if a consumer contacts Navient to report it, if the error is not escalated beyond a first-level customer service representative, Navient does not necessarily identify and fix the underlying issue causing the error to prevent it from recurring. As a result, some consumers have suffered the same payment processing error in multiple months.

123.   Moreover, Navient does not categorize most non-escalated consumer inquiries about payment processing errors. When borrowers and cosigners with non-escalated consumer inquiries contact Navient about payment processing errors, Navient personnel generally record details about the error in a freeform, narrative style in notes in the consumer's account, but those personnel are unable to use any codes or tags to categorize the inquiry or concern.

124.   Navient, thus, is unable to systematically search and/or aggregate these non-escalated inquiries. As a result, Navient has been unable to effectively understand many of the problems that consumers are experiencing with respect to payment processing and take action to prevent these problems from recurring or from impacting the same consumer again and again.

**The Student Loan Resolution Scam/Legal Malpractice by the Attorney and Law Firm Defendants, Kevin Mason, Chantel Grant, Kevin Mason Law, P.A., and GM Law Firm, LLC on Behalf of Plaintiff and the Attorney Law Firm Class Members.**

125.    Plaintiff, like the Attorney and Law Firm Class Members represented by this class action lawsuit, has been a victim of (gross) legal malpractice, or fraud and other related bad acts, at the hands of Kevin Mason, Chantel Grant, Kevin Mason, P.A., GM Law Firm, LLC, and other currently unidentified attorneys and business entities under which these attorneys have operated their so-called "private student loan resolution" legal services.

126.    The following are some illustrative consumer/client complaints relating to (gross) legal malpractice, or frauds, committed by the Attorney and Law Firm Defendants against Plaintiff and the Attorney and Law Firm Class Members, as relates to the Attorney and Law Firm Defendants' so-called "private student loan resolution" legal services that are at issue in this class action lawsuit (spelling and grammar mistakes remain as found in the original) (CollegeInvestor.com, Forums, (May 4, 2017), http://forums.thecollegeinvestor.com/index.php?topic=367.0)

**Topic: Kevin Mason Law Firm**

a.   June 13, 2016 (KCoop156): Has anyone worked or heard of Kevin Mason PA out of Boca Raton Florida. They told me they could sue my private student loans for consumer compliance issues and get them dismissed or settled for a lot less. I would be responsible for 50% of what I currently owe. He is a member of the florida state bar in good standing. But i havent found much more than that. I am afraid to get into a contract with him but then it be a scam. Would love some feedback.

b.   June 13, 2016 (Response from College Investor Administrator): I've never heard of them, but that doesn't mean anything. There are tons of lawyers (both good and bad), out there.

Just be very careful in working with any law firm. Make sure that you ask them exactly what steps they are going to take in fighting your debt.

A lot of people get burned dealing with law firms trying to get their student loan debt dismissed.

Make sure they don't ever:
1. Ask you to stop making payments
2. Ask you to make payments to them

Both of these are big red flags that they are NOT trying to help you.

Most people don't ever need a student loan lawyer unless you're struggling to get out of default, or you are being sued by your private lender.

If neither of these apply, all good lawyer will:
1. Validate that the debts are legitimate (which you likely know to be the case)
2. Validate that they haven't violated any debt collection laws (which you could sue them for violating)

If you're making payments and have no issues, then a lawyer isn't a good option. If you did have one of the issues above, a lawyer could help.

When working with a lawyer, I prefer fee based approach for their time, versus settlement based approach. You simply pay for the lawyers time. Most won't do it, but many legitimate ones will.

c.  July 21, 2016 (Response from College Investor Administrator): We don't recommend you make payments to a law firm and not your students loans because it will harm your credit score dramatically by not making payments.

While we don't know any plan of action you put together with this firm and what your individual arrangement is, a typical scenario looks like this:
- You stop paying your lender and make the same payment to this law firm
- Your credit score is badly damaged and your lender starts moving your loan to collections
- After a long time (it can vary from months to years), this law firm attempts to settle your debts by telling the lender "see, this guy is broke and hasn't made a payment to you in years... why don't you just settle and get what money you can today".
- The lender can always say nope, we will sue and garnish his wages and collect our debt. There is no way for them to truly guarantee a 50% cut in the loan.

No matter what the end result is, we've typically always seen the person who did them (i.e. you) in worse shape than before you started. There are no guarantees, the process can take years, and meanwhile you've harmed your credit to a point where you're not going to be buying a house, car, or maybe even have trouble renting an apartment for a long time.

Plus, making 5 years of payments to them versus your lender loses a lot of progress you could have actually made on your student loan debt.

Next steps going forward? I would look at your contract with them and see how you can cancel. I would tell them you are canceling. If you do think something is amiss, I would also encourage you to contact your state's attorney general, the Consumer Finance Protection Bureau, and even your State Bar and report the lawyer.

As for some red flags to look for based on what you wrote:
- You say this money is in an escrow account - what are the terms of the escrow

agreement and is this escrow account held by a third party? That is a good indicator of whether the firm is being honest. A true escrow account will not be owned or operated by the law firm, but will be a completely third party and there will be terms about when the money can be withdrawn either to be returned to you or paid to the law firm.

- How can the law firm be late filing paperwork for you and what paperwork are they actually filing? What are you asking be done at Transunion that would require a lawyer?  Whether or not its a scam, a firm that does not meet deadlines set forth in the original agreements is never one I want to work with.

d. July 25, 2016 (Final response from College Investor Administrator) If you're paying by credit card I would dispute the charge and cancel the contract with them. You run the risk they would collect, but it's probably less harm to your credit than what they propose.

Second, I would report them to the CFPB and the state attorney general. The whole thing sounds wrong, unprofessional for sure.

e. August 8, 2016 (Response from G434): Complain to Attorney General and FL Bar. I am in same boat and will not slander as I do not want to end up in defermation law suit. I am just encouraging to use proper channels to resolve this. It seems after 1 year, those who have been involved are realizing (unfortunately a bit late) that something is really wrong.

f. October 5, 2016 (Response from bgrasso): Hello everyone,

I just wanted to weigh in on my experience so far with Kevin Mason law handling my private student loans with Navient (Sallie Mae).
Last September I was contacted by Joe DeVito from National Legal Staffing Support on behalf of Kevin Mason PA to sue Navient for unlawful practices. He told me Kevin Mason had been very successful with getting student loans from Navient completely dismissed. At this point I had been paying my private student loans over $700/month for about 5 years and hadn't seen even a dent made  in my principal balance (around $100k). I was desperate and Joe told me exactly what I wanted to hear, like "you can finally buy a house and start a life!", and caught me hook line and sinker. He told me to stop making payments to Navient immediately and I would start making the same monthly payments ($718/month) to the law firm but I would only make them for 5 years, versus 10 years with navient, and no interest would accrue. He told me the $ I paid them would go towards legal fees and if Navient settled for a small amount (1-2%) instead of completely dismissing my loans. He also said legal assistants would monitor my credit, as well as my father's (who co-signed my loans), to make sure Navient wasn't reporting anything negative as it is illegal for them to do so once they receive cease & desist letters from the law firm.
I honestly still can't believe I fell for any of this. A few months in I noticed they weren't doing things they said they would (like sending paperwork as another person on the forum stated). I was offered a job in NY at the beginning of this year and needed to get an apartment here. That's when I found out my credit score had gone from a 700 to a 500 and I had to pay double the amount of a deposit on an apartment just to move. I contacted my legal assistant at National Legal Staffing Support and she said there was nothing they could do besides send dispute letters to the credit bureaus which I got no actual proof of them doing and even if they did it didn't help at all. My fathers credit also dropped and he couldn't

even rent a car to help me move. No one at the law firm seemed to care or even remember I was told my credit would be monitored and this wouldn't happen. In August I received an email from them saying Navient had sent them a settlement offer (although I never got actual proof of this offer) for $41,500. I thought it was great news since I was told the money I was paying the law firm would go towards a settlement but boy was I wrong. After pretty much having to beat a real answer out of Joe he told me I would have to pay both the settlement from Navient AND the law firm, meaning it would equal around the same amount as my original loan balance and all I did was ruin my credit. They said they would keep trying to go for complete dismissal but it seemed like all they were using for dismissal were the 3 calls Navient made to me since receiving the cease & desist from the law firm. I was given no actual proof of them doing any case work and I really believe they will just use illegal calls made for dismissal.
I started doing research on Kevin Mason and NLSS and a lot of people were saying it's a scam and to contact the Attorney General of Florida so I did. I gave them the whole story and when someone contacted me back last week they asked for more information and said they were sending my complaint to Kevin Mason but all they could really do is mediate the complaint  between us. Yesterday I received a VERY angry voicemail from someone named Greg at NLSS who literally screamed at me for filing the complaint, stated they "bent over backwards for me" when I needed a 5 day payment extension ONE time, and they've "worked so hard on my case" and are going to cancel it. I'm actually terrified to call back because this person berated me so much just on a voicemail message. Has anyone else gone this far yet with them and had any sort of help from the attorney general? I have no idea what is going to happen next and I'm scared to find out.

g.  October 10, 2016 (Follow up comment from bgrasso): Hi Swamileoni,

I finally was able to get Joe DeVito (not DeSilva as you stated) to send me an email on how the debt settlement would work after he called me numerous times and I kept emailing him to tell him I wanted the information in an email and not over the phone as I feel they twist their words over the phone. When I first spoke to Joe last year about signing up for the program he told me Kevin Mason would challenge the debt with Navient by using unethical practices and classes I was charged for and didn't need but now they seem to only be concerned with having the Call Log filled out and one of the legal assistants I deal with at NLSS stated the last time I spoke to him "we're going to need these calls if we want full dismissal of the loans" which made me believe they aren't doing any real work and are just going to use the 3 illegal calls Navient has made to me since receiving the cease & desist from the "law firm". I am going to email Joe this week to ask for detailed information on all the work they've done on my case so far and will withhold any future payments to NLSS until I receive the info. And no, they did not send me an actual settlement letter from Navient, just a letter typed up by Kevin Mason stating the law firm received a settlement offer from Navient for the $41,500 so I will be asking for proof of that as well.
Have you tried disputing any payments you made to the law firm? I've paid them almost $10,000 now and I'm just going to assume I probably won't be getting any of that back. And have you already reached out to the Attorney General in Florida? Someone from the Department of Agriculture contacted me back but I don't seem to be getting anywhere with them, they just keep telling me to get a lawyer, a real lawyer.

127.    The following are some additional illustrative consumer/client complaints and

questions from Reddit.com relating to (gross) legal malpractice, or frauds, committed by the

Attorney and Law Firm Defendants against Plaintiff and the Attorney and Law Firm Class

Members, as relates to the Attorney and Law Firm Defendants' so-called "private student

loan resolution" legal services that are at issue in this class action lawsuit (spelling and

grammar mistakes remain as found in the original) (Reddit.com, Forums, (May 4, 2017),

https://www.reddit.com/r/personalfinance/comments/3je2to/kevin_mason_law_office_st

udent_loan/

## "Kevin Mason Law Office student loan consolidation/forgiveness a scam?" Reddit Comment Thread:

a.    Submitted '1 Year Ago" by pinion13: I was hoping someone could shed
some light on this and I figured this sub might be the place to do it. This
law office: www.kevinmasonlaw.com called offering legal assistance with
basically taking action against the company servicing my private loans
and promising that they could cut the loans in half through a settlement.
The part that makes me feel like it is a scam is I would have to then,
apparently, pay back the law office because they will "pay off" my loans.
This is if I understood correctly. I got all the information from her in an
email and told her I couldn't continue talking right now, but would be in
touch. This almost sounds like something that could be legit, but who
knows. What do you guys think, is this a scam?

b.    Response from DebtResThowaway: Here's how it works: Kevin Mason
handles unsecured debt and private student loans. He does not deal with
federal student loans, mortgages, etc.Kevin Mason charges 50% of the
unsecured debt that you want dismissed as a retainer fee. This is of the
principal amount, not the total payoff if you kept making payments (which
is usually 2-3 times more). He allows you to pay this amount in monthly
payments that have no financing or interest attached.
There are two outcomes. He is able to completely dismiss the debt or
settle for a fraction of the amount. The dismissals occur when the

creditors have violated the consumers rights (usually either through the a few different acts, FCBA is one of them). If there is more interest I'll dig up the exact ones.

For a private student loan, lets take an extreme just for the sake of discussion. Let's say you see a commercial for a trade school. It advertises that people graduating are earning 50k a year and they have a 98% placement rate of their students. You are excited and decide to enroll. You are young and don't know much about finance. They loan you 60k.

You graduate and can't get a job for a year or two. You take crap jobs in the meantime because you know now with your new skillset it is a matter of time till you are doing what you love. Except you find that job , and it pays 35k a year. You ask around , maybe contact some old school mates, they are all either not in their field of study or earning 30-40k a year. How can a financial institution think an 18 year old who is going into a field that pays 35k a year is ever going to be able to pay back 60k?(really far more once you compute the terms)? Did the advertisement claiming 98% placement misrepresent the "product" that was financed?

This is an over simplified slam dunk scenario just to give you an idea of the possibilities when using a lawyer who specializes in consumer protection law.

No lawyer can give a guarantee, it would be like you getting arrested for murder and the lawyer telling you he can guarantee you will get off.

One other thing, Kevin Mason is not a bankruptcy lawyer. This isn't because bankruptcy is inherently bad, it's just not what he specializes in. In some cases bankruptcy may be the better option for you.

c.   Response from CynFul22: Can you speak to what happens to your credit and your co-signers credit while Mr. Mason is fighting to lower your debt? Also, I received their retainer for half my debt, but what concerns me is that no where in writing does it state that the money I pay into the trust account each month for the length of my dispute will be used to settle the original debt. Does that make sense? So let's say I sign this retainer for nearly $42k, and Mr. Mason is able to get my debt lowered from the current $82k down to $50k. Where does it ever specify that I will not be responsible for the $50k AND NOW on top of that this $42k retainer. Hope that makes sense, any feedback would be appreciated.

d.   Response from MyMoronRadarFoundYou: They are only offering settlement services where they offer a settlement, and do not offer any sort of guarantee. In addition they are pushing student loan consolidation and modification as if it is only a service they can do when actually all federally insured student loans offer students an opportunity to apply for these directly with the servicer. In addition he is slyly implying that he can handle the forgiveness of the debt, but that's through bankruptcy, which any BK attorney can do. Federally insured student loans are generally exempt from being discharged in a bankruptcy so that probably won't work

e.   Answer to question ("Did you ever move forward with them? I (G_Blaze) just got a call from them today and I kind of got that "scam" feeling.) from pinion13: No I didnt, felt to much like a scam. It felt like they would take over your debt, then try to battle it out in court to try to reduce them, and if they can't lower the debt they would more than likely charge you for their services and now they have your debt, probably at a higher interest rate. Somewhere in their contract I'm sure there is something that will completely screw you over.

128.   The following is another illustrative comment post from the Web site,

Disqus.com, that shows the legal malpractice, or frauds, that Plaintiff and the Attorney and

Law Firm Class Members have suffered at the hands of Kevin Mason, Chantel Grant, Kevin

Mason Law, P.A., GM Law Firm, LLC, and currently unidentified attorneys and business

entities under which these so-called "private student loan debt resolution" legal services have

been marketed, and improperly-solicited, causing great financial and other harms to Plaintiff

and the Attorney and Law Firm Class Members:

(Disqus.com, (May 4, 2017),

https://disqus.com/home/discussion/getoutofdebtguysite/this_is_how_you_can_settle_yo

ur_navient_student_loan/, posted by "Brittany Grasso":

Also wondering what happened during/after your settlement with Kevin Mason? Since Navient offered a 55% settlement and you were only paying 50% to Kevin Mason did you have to pay the remaining 5%? Also, was your credit fixed after the lawsuit?

I was also suckered into using Kevin Mason law to lower the remaining $92k+ on my private Navient loans and now owe $46k+ to Kevin Mason and have been paying them over $700 a month for about a year now.

They never warned me that my pretty great credit score would be completely destroyed as well as my dad's, who was my co-signer. It's really stressing me out and I'm losing a lot of sleep lately. I actually missed a wedding yesterday because I tried renting a car and couldn't because of my now 498 credit score.

They keep telling me it will take up to 3 years for a resolution and there isn't a guarantee my credit will be fixed, 2 things they never mentioned in the beginning and I honestly can't imagine suffering through 2 more years of bad credit and stress like this.

I should've just kept paying Navient the $700+ a month for the next 10 years just for peace of mind I guess. I also just received letters from Navient saying my loans are now in default and will be turned over to a collection agency..did this happen to you as well? I emailed the person I'm set up with at national legal staffing about how they can still have a suit against Navient now that my loans are now in the hands of a collection agency and they haven't gotten back to me yet.

Any advice on what I can do or what my rights are? Please help!

129.    Plaintiff was improperly-solicited, like Attorney and Law Firm Class Members, by the Attorney and Law Firm Defendants and has suffered from the legal malpractice, or frauds, depicted in the above online comments that have been included in this class action lawsuit.

130.    A copy of Plaintiff's Power-of-Attorney Agreement ("POA"), executed by Plaintiff and attorney, Kevin Mason, on behalf of the Attorney and Law Firm Defendants, is attached, and incorporated into, this Complaint as Exhibit "3".

131.    This POA, Ex. 3, is an unlawful, unconscionable, and unethical attorney-client contract. Among many other problems (which are simultaneously violation of the applicable Rules of Professional Conduct and ABA Model Rules of Professional Conduct for attorneys), this POA gives complete, final, and absolute settlement authority to Kevin Mason, P.A., and "any of its attorneys."

132.    As a matter of fact, the CFPB has released at least two separate Consumer Advisory Notices specifically stating that so-called "student loan debt resolution" programs, of the nature perpetuated by the Attorney and Law Firm Defendants in this matter, are, in a nutshell, scams.

133.    The first of these CFPB Consumer Advisory Notices, "Consumer Advisory: You don't have to pay someone to help you with your student loans," July 3, 2013, by Rohit Chopra, is attached, and incorporated into, this Complaint as Exhibit "4".

134.    The second of these CFPB Consumer Advisory Notices, "Consumer Advisory: Student debt relief companies may cost you thousands of dollars and drive you further into debt," December 11, 2014, by Rohit Chopra, is attached, and incorporated into, this Complaint as Exhibit "5".

135.    Further, the Attorney and Law Firm Defendants have materially misrepresented (either in a grossly-negligent manner or through actual knowledge of the material misrepresentations) the attorney fees that their clients are liable to pay. The 50% of

the principal balance of all student loan fee that the Attorney and Law Firm Defendants is (mis)represented as a ten-year, monthly payment under some sort of global-student-loan-debt-settlement-program, and **not** as an attorneys' fee. This is precisely the misrepresentation that occurred with Plaintiff and the Attorney and Law Firm Class Members.

136.    This program of so-called "private student loan debt resolution" legal services perpetuated, and improperly-solicited, by the Attorney and Law Firm Defendants in this matter constitutes the following causes of action, as relates to the Plaintiff and the Attorney and Law Firm Class Members in this Complaint: (1) (gross) legal malpractice; (2) breaches of fiduciary duties; (3) negligent misrepresentation of material facts; (4) intentional misrepresentation of material facts; (5) fraud in the inducement; (6) fraud in the factum; and (7) conversion of the Plaintiff's and the Attorney and Class Members' payments made to these Attorney and Law  Firm Defendants.

137.    As a sole and proximate result of the above-referenced seven causes of action pleaded against the Attorney and Law Firm Defendants in this Complaint, Plaintiff and the Attorney and Law Firm Class Members have suffered severe financial damages and other injuries to be determined by the jury at trial. The Plaintiff and Class Members further make demand against the Attorney and Law Firm Defendants for a refund of all monies paid to any of these Attorney and Law Firm Defendants (the concealed "legal fees"), punitive damages, attorneys' fees, pre-and-post judgment interest, statutory damages, and all other relief permitted by law and equity.

## CLASS ACTION ALLEGATIONS

138.    Plaintiff brings this lawsuit as a class action on behalf of himself, individually,

and all others similarly situated as members of the proposed Classes pursuant to Federal

Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity,

commonality, typicality, adequacy, predominance, and superiority requirements of those

provisions.

139.    The Three Classes (and their Sub-Classes) are defined as:

**Nationwide Class 1:** All individuals in the United States who have suffered from
unlawful, fraudulent, or deceptive loan-inducement activities as relates to their private
student loans originated, or serviced by, SLM, Inc., d/b/a Sallie Mae ("Sallie Mae") or
Navient Solutions, LLC d/b/a the Navient Corporation, or its wholly-owned
subsidiary, Navient Solutions, Inc. (the "Navient Defendants"), formerly known as
Sallie Mae, Inc., in violation of The Truth in Lending Act (TILA), 15 U.S.C. § 1601,
*et. seq.*, as amended, the Consumer Financial Protection Act of 2010, and the
violations by the Navient Defendants of any other common law duties.

**Southern United States Sub-Class:** All members of the Nationwide Class 1 who
reside in any Southern geographic states of the United States.

**Mississippi Sub-Class:** All members of the Nationwide Class 1 who reside in the
State of Mississippi.

**Nationwide Class 2:** All individuals in the United States who have suffered from
unlawful collection activities by the Navient Defendants as relates to their Navient-
serviced student loans under the Consumer Financial Protection Act of 2010 (CFPA),
12 U.S.C. §§ 5531, 5536(a), 5564, 5565; the Fair Credit Reporting Act (FCRA), 15
U.S.C. §§ 1681 *et seq.*, and its implementing regulation, Regulation V, 12 C.F.R. part
1022; the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 *et seq.*; and
the Telephone Consumer Protection Act (TCPA), 47 U.S.C. §§ 227 *et seq.*, based
upon unlawful acts and practices in connection with Defendants' servicing and
collection of student loans

**Southern United States Sub-Class:** All members of the Nationwide Class 2 who
reside in any Southern geographic states of the United States.

**Mississippi Sub-Class:** All members of the Nationwide Class 2 who reside in the
State of Mississippi.

**Nationwide Class 3:** All individuals in the United States who have suffered financial loss at the hands of Defendants, Kevin Mason, P.A., GM Law Firm, LLC, Kevin P. Mason, esq., individually, or Chantel L. Grant, esq., individually (the "Attorney and Law Firm Defendants"), due to those attorneys', and their law firms': legal malpractice, breach of contract, breach of express and implied warranties, breaches of fiduciary duties, fraud, or conversion of personal property, as relates to these Defendants' improperly-solicited legal services of so-called "private student loan debt resolution."

**Southern United States Sub-Class:** All members of the Nationwide Class 3 who reside in any Southern geographic states of the United States.

**Mississippi Sub-Class:** All members of the Nationwide Class 3 who reside in the State of Mississippi.

140.    Excluded from the Classes and Sub-Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

141.    Numerosity: Although the exact number of Class Members for each of these three proposed Classes is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members for each of these three proposed Classes are readily identifiable from information and records in Defendants' possession.

142.   Typicality: Plaintiff's claims are typical of the claims of the Class in that

Plaintiff, like all Class Members, had students loans that were improperly induced and

originated by the Navient Defendants; have had these student loans improperly serviced and

collected upon by the Navient Defendants; and the Plaintiff has suffered financial loss due

to the legal malpractice, or fraud, committed by the Attorney and Law Firm Defendants

named in this lawsuit. The claims of the members of the three proposed classes in this

lawsuit are each typical of one another due to the fact that they are common, and similar,

losses that have occurred as a result Defendants' various, and consistent, patterns of

misconduct. These three proposed classes of claims are typical in that the Plaintiff has

incurred, or will incur, similar financial losses to the members of each of the three proposed

Classes in this litigation, for the reasons pleaded, above, in this Complaint.

143.   Commonality: There are numerous questions of law and fact common to

Plaintiff and the Class that predominate over any question affecting only individual Class

Members. These common legal and factual issues have been pleaded, above, in this

Complaint. They will not, therefore, be repeated in this Paragraph.

144.   Adequate Representation: Plaintiff will fairly and adequately protect the

interests of the Class Members of each of the three proposed Classes in this Complaint.

Plaintiff has retained attorney(s) experienced in the prosecution of class actions, including

consumer class actions, and Plaintiff, and his counsel, intend to prosecute this action

vigorously, and through trial and appeal(s), if necessary.

145.   Predominance and Superiority: Plaintiff and Class Members have all suffered

and will continue to suffer harm and damages as a result of Defendants' unlawful and

wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION
### (Violations of the Consumer Financial Protection Act of 2010 by All Named-Defendants in this Complaint)

146.    Plaintiff incorporates by reference the facts pleaded in the preceding paragraphs of this Complaint.

147.    Sections 1031 and 1036 of the CFPA prohibit a "covered person" from committing or engaging in any "unfair, deceptive or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). Defendants are "covered person[s]" within the meaning of the CFPA. 12 U.S.C. § 5481(6).

148.    Defendants are a "person" as defined by the CFPA.

149.    An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is

not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. §
5531(c).

150.   An act or practice is deceptive if it misleads or is likely to mislead the
consumer; the consumer's interpretation of the act or practice is reasonable under the
circumstances; and the misleading act or practice is material.

151.   An act or practice is abusive if it, among other things, takes unreasonable
advantage of the reasonable reliance by the consumer on a covered person to act in the
interests of the consumer. 12 U.S.C. § 5531(d).

152.   Defendants' unfair, abusive, and deceptive acts or practices occurred
repeatedly in Defendants' trade or business (this is true of all three categories of Defendants
in this Complaint), were capable of deceiving a substantial portion of the purchasing public,
and imposed serious financial risks upon the public.

153.   As pleaded in this Complaint, the Navient Defendants, have violated the
CFPA as to Plaintiff and the Navient-Serviced Student Loan Class Members (proposed
Nationwide Class 2) in the following specific manners: (1) abusive acts or practices related to
"steering" borrowing into forbearance of their Navient-serviced student loans; (2) unfair acts
or practices related to "steering" borrowing into forbearance of their Navient-serviced
student loans; (3) unfair acts or practices by the Navient Defendants as related to the
recertification of their Navient-serviced Student Loans; (4) deceptive acts of practices related
to "steering" borrowing into forbearance of their Navient-serviced student loans; (5)
deceptive acts or practices related to cosigner-release requirements; and (6) unfair acts or
practices related to payment-processing errors.

154.    Likewise, as pleaded in this Complaint, the Attorney and Law Firm Defendants have engaged in unfair, deceptive, abusive, and fraudulent practices as relates to the so-called "private student loan resolution" legal (consumer) services provided to Plaintiff and Attorney and Law Firm Class Members. These violations of the CFPA have been detailed, above, in this class action lawsuit.

### SECOND CAUSE OF ACTION
**(Violations of the Telephone Consumer Protection Act by the Navient Defendants)**

155.    Plaintiff and the Navient-Serviced Student Loan Class Members incorporate, by reference, all of the facts pleaded in the preceding Paragraphs of this Complaint.

156.    The Navient Defendants, at all relevant times, were a "covered person" under the TCPA, as amended.

157.    The Navient Defendants have committed repeated, systemic, knowing, and malicious violations of the TCPA against both Plaintiff and the Navient-Serviced Student Loan Class Members, as detailed in this Complaint.

158.    These knowing and intentional FCPA violations have caused significant harm and emotional distress to Plaintiff and the Navient-Serviced Student Loan Class Members.

159.    The Navient Defendants are liable to Plaintiff, and the Navient-Serviced Student Loan Class Members, for statutory damages under the TCPA, punitive damages, economic damages, hedonic damages, attorney's fees, and all costs of litigation.

### THIRD CAUSE OF ACTION
**(Violations of the Truth in Lending Act by the Navient Defendants)**

160.    Plaintiff and the Inducement/Origination Class Members incorporate, by reference, all of the facts pleaded in the preceding Paragraphs of this Complaint.

161.    The Navient Defendants, at all relevant times, were a "covered person" under the TILA, as amended.

162.    The Navient Defendants have committed repeated, systemic, knowing, and malicious violations of the TILA against both Plaintiff and the Inducement/Origination Class Members, as detailed in this Complaint.

163.    These knowing and intentional TILA violations have caused significant harm and emotional distress to Plaintiff and the Inducement/Origination Class Members.

164.    The Navient Defendants are liable to Plaintiff, and the Navient-Serviced Student Loan Class Members, for complete and absolute recession of all promissory notes induced by fraud or misrepresentation, as well as statutory damages under the TILA, punitive damages, economic damages, hedonic damages, attorney's fees, and all costs of litigation.

## FOURTH CAUSE OF ACTION
### (Violations of the Fair Credit Reporting Act by the Navient Defendants)

165.    Plaintiff and the Navient-Serviced Student Loan Class Members incorporate, by reference, all of the facts pleaded in the preceding Paragraphs of this Complaint.

166.    The Navient Defendants, at all relevant times, were a "covered person" under the FCRA, and its implanting regulations, as amended.

167.    The Navient Defendants, as detailed in this Complaint, have repeatedly and systemically reported (knowingly false) information about Plaintiff and the Navient-Serviced Student Loan Class Members to the major credit reporting bureaus in the United States.

168.    The Navient Defendants are liable to Plaintiff, and the Navient-Serviced

Student Loan Class Members, for statutory damages under the FCRA, punitive damages,

economic damages, hedonic damages, attorney's fees, and all costs of litigation.

169.    As a direct and proximate result of the Navient Defendants repeated and

knowing violations of the FCRA, as amended, Plaintiff and Class Members suffered, and will

continue, to suffer actual damages.

170.    Plaintiff and the Class are entitled to equitable relief.

### FIFTH CAUSE OF ACTION
**(Gross Negligence – Legal Malpractice/Negligent Misrepresentation of Material
Facts as to the Attorney and Law Firm Defendants)**

171.    Plaintiff and the Attorney and Law Firm Class Members incorporate, by

reference, the facts pleaded in the preceding paragraphs of this Complaint.

172.    Attorneys, Kevin Mason and Chantel Grant, and their law firms, Kevin

Mason, P.A., and GM Law Firm, LLC, and currently unidentified attorneys and business

entities working with these attorney and law firms (John and Jane Does 1-5 and XYZ

Business Entities 1-5) have committed breaches of the professional and fiduciary duties that

they owed to Plaintiff and the Attorney and Law Firm Class Members, as described in this

Complaint.

173.    As a result of their reasonable reliance on Attorney and Law Firm

Defendnants' grossly-negligent omissions/grossly-negligent legal services, Plaintiff and

Attorney and Law Firm Class Members have suffered an ascertainable loss of money,

property, and other damages (including damage to their credit reports).

174.    Plaintiff and Attorney and Law Firm Class Members demand: all actual damages suffered as a result of the (gross) negligence of these Defendants, a refund of all monies paid to these Defendants, with pre-and-post judgment interest, all attorney's fees, costs of litigation, and punitive damages. These Attorney and Law Firm Defendants are joint-and severally liable – based upon their concerted action and scheme – for all actions of the fellow members of this class of Defendants, as pleaded in this Complaint.

## SIXTH CAUSE OF ACTION
### (Fraud as to All Defendants)

175.    Plaintiff and the Class Members incorporate, by reference, the facts pleaded in the preceding paragraphs of this Complaint.

176.    The intentional misrepresentations of material facts by the Navient Defendants, as pleaded throughout this Complaint, including in the inducement, origination, servicing, and collection of the Navient Student Loans at issue in this lawsuit, constitute common law fraud perpetuated against Plaintiff, the Inducement/Origination Class Members, and the Navient-Serviced Student Loan Class Members.

177.    Further, and similarly, the intentional misrepresentation of material facts related to the so-called "private student loan resolution" legal services allegedly to be provided by attorneys, Kevin Mason and Chantel Grant, and their law firms, Kevin Mason, P.A., and GM Law Firm, LLC, and currently unidentified attorneys and business entities working with these attorney and law firms (John and Jane Does 1-5 and XYZ Business Entities 1-5), constitute separate frauds that have been committed against Plaintiff and the Attorney and Law  Firm Class Members, as detailed in this Complaint.

178.    The Attorney and Law Firm Defendants have committed knowing and intentional breaches of the professional and fiduciary duties that they owed to Plaintiff and the Attorney and Law Firm Class Members, as described in this Complaint.

179.    As a result of their reasonable reliance on Attorney and Law Firm Defendants' fraudulent misrepresentations, detailed in this Complaint, Plaintiff and Attorney and Law Firm Class Members have suffered an ascertainable loss of money, property, and other damages (including damage to their credit reports).

180.    As a result of their reasonable reliance on the knowing and material misrepresentations made by the Navient Defendants, as detailed in this Complaint, the Plaintiff, the Inducement/Origination Class Members, and the Navient-Serviced Student Loan Class Members have suffered an ascertainable loss of money, property, and other damages (including damage to their credit reports).

181.    Plaintiff, Inducement/Origination Class Members, Navient-Serviced Student Loan Class Members, and Attorney and Law Firm Class Members, as a result of these frauds on the part of all Defendants demand: all actual damages suffered as a result of the fraudulent acts or misrepresentations of the Defendants, a refund of all monies paid to the Defendants, with pre-and-post judgment interest, all attorney's fees, costs of litigation, and punitive damages.

## SEVENTH CAUSE OF ACTION
### (Conversion as to the Attorney and Law Firm Defendants)

182.    Plaintiff and the Attorney and Law Firm Class Members incorporate, by reference, the facts pleaded in the preceding paragraphs of this Complaint.

183.    Attorneys, Kevin Mason and Chantel Grant, and their law firms, Kevin Mason, P.A., and GM Law Firm, LLC, and currently unidentified attorneys and business entities working with these attorney and law firms (John and Jane Does 1-5 and XYZ Business Entities 1-5) have committed the tort of conversion as to all payments made to them by the Plaintiff and the Attorney and Law Firm Class Members, as described in this Complaint.

184.    The Attorney and Law Firm Defendants have mishandled the payments they have received from their clients, like Plaintiff and the Attorney and Law Firm Class Members, by treating these payments as their own property, when, in fact, these payments were paid, in trust, to the Attorney and Law Firm Defendants for the sole purpose of using these funds to pay these clients' Navient-serviced student loans.

185.    As a sole and proximate result of these wrongful acts of conversion of client-money on the part of the Attorney and Law Firm Defendants, Plaintiff and Attorney and Law Firm Class Members have suffered an ascertainable loss of money, property, and other damages (including damage to their credit reports).

186.    Plaintiff and Attorney and Law Firm Class Members, as a result of these wrongful acts of conversion on the part of the Attorney and Law Firm Defendants demand: all actual damages suffered as a result of the acts of conversion; a refund of all client-monies converted to by the Attorney and Law Firm Defendants, with pre-and-post judgment interest; all attorney's fees; costs of litigation; and punitive damages.

## RELIEF REQUESTED

187.    Plaintiff, on behalf of himself, individually, and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

(a) An order certifying the proposed Classes and Sub-Classes, designating Plaintiff as named representative of the Classes, and designating the undersigned as Class Counsel for each of these Classes and Sub-Classes, as described in this Complaint;

(b) A declaration that Defendants are financially responsible for notifying all Class Members about the violations of law, as detailed in this Complaint;

(c) An order enjoining Defendants from further violations of the statutes and common law duties, the violations of which have been detailed extensively in this Complaint;

(d) A declaration requiring Defendants to comply with the various provisions of the CFPA, the TILA, the TCPA, the FCRA, the FDCPA, as well as all common law and fiduciary duties owed to Plaintiff and the Class Members (as to each Class and Sub-Class described in this Complaint);

(e) An award to Plaintiff and the Classes and Sub-Classes for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(f) Any and all remedies provided under the CFPA, the TILA, the TCPA, the FCRA, the FDCPA, as well as all common law and fiduciary duties owed to Plaintiff and the Class Members (as to each Class and Sub-Class described in this Complaint);

(g) A declaration that Defendants must disgorge, for the benefit of the Classes and Sub-Classes, all or part of the ill-gotten profits that they have received from the violations of consumer-protection statutes or the common law and fiduciary duties, as described in this Complaint;

(h) An award of attorneys' fees and costs, as allowed by law;

(i) An award of attorneys' fees and costs pursuant to Mississippi statutory and common law;

(j) An award of pre-judgment and post-judgment interest, as provided by law;

(k) Leave to amend the Complaint to conform to the evidence produced at trial; and

(l) Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

188.    Pursuant to Federal Rule of Civil Procedure 38(b), and any applicable Local Rules, Plaintiff demands a trial by jury of all issues in this action so triable.

Respectfully,

WILLIAM L. LAMEY, on behalf of himself and all of those similarly situated

By: _____

Macy D. Hanson
An Attorney for the Plaintiff

MACY D. HANSON – MS BAR # 104197
macy@macyhanson.com
THE LAW OFFICE OF MACY D. HANSON, PLLC
THE ECHELON CENTER
102 FIRST CHOICE DRIVE
MADISON, MISSISSIPPI 39110
TELEPHONE: (601) 853-9521